**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CASE NO. 1:25-cr-397 |
| | ) | |
| | ) | |
| Plaintiff, | ) | CHIEF JUDGE SARA LIOI |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| MAURICE J. SINKFIELD, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

On August 19, 2025, an indictment issued charging defendant Maurice J. Sinkfield with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8) and with escape from custody, in violation of 18 U.S.C. § 751(a). (Doc. No. 10 (Indictment).) Now before the Court is Sinkfield's motion to supress evidence derived from the search of his vehicle following his seizure on July 24, 2025. (Doc. No. 23 (Motion).) Sinkfield argues that the evidence must be suppressed because law enforcement violated his Fourth Amendment rights when they seized him and searched his vehicle. (*Id.* at 8.)[1] Plaintiff the United States of America (the "government") opposes the motion. (Doc. No. 38 (Opposition).) Sinkfield filed a reply and supplemental brief in support of his motion.[2] (Doc. No. 41 (Reply); Doc. No. 45 (Sinkfield Supplement).) On February 18, 2025, the Court conducted an evidentiary hearing on

---

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

[2] With permission of the Court, at and after the evidentiary hearing on the motion, the government provided supplemental authority responsive to information in the defendant's recently filed reply. At the request of the defendant, the Court granted the parties leave to file supplemental briefing relating to the supplemental authority. (Minutes of Proceedings [non-document] 02/18/2026.)

the motion. At the conclusion of the hearing, the Court took the motion under advisement. For the reasons stated below, Sinkfield's motion is DENIED.

## I. BACKGROUND

Four witnesses testified at the evidentiary hearing. The Court heard first from three agents with the Ohio Investigative Unit ("OIU"): Agents Thomas French, Clayton Criss, and James Gaal. Agent French has over three years of experience with the OIU. During his time with the OIU, Agent French estimates he participated in hundreds of firearms-related incidents and arrests. Agent French is also a field training officer tasked with instructing new OIU agents. Agent Criss has been employed with the OIU since January of 2025, and on July 24, 2025, accompanied Agent French as part of OIU's field training program. Agents French and Criss received training relating to the use of firearms and the identification of concealed firearms. Agent Gaal has been with the OIU for 18 years.

The Court also heard from Timothy Clark, an investigator with the Federal Public Defender's Office. Investigator Clark has worked with the Federal Public Defender's Office for approximately a year and a half. Before that, he worked as an investigator for the U.S. Army Judge Advocate General's Office for approximately three years and for the Cuyahoga County Prosecutor's Office for approximately 10 years. Earlier in his career, Investigator Clark was a police officer in Cleveland for approximately 14 years.

### A. Initial Surveillance

On July 24, 2025, agents with the OIU, including Agents French, Criss, and Gaal, conducted a surveillance operation at the Rapid Gas Stop gas station located at 1712 East 55th Street in Cleveland Ohio. The OIU often conducts such surveillance operations at premises licensed to sell liquor, like the Rapid Gas Stop, to monitor for criminal activity such as criminal

trespass, alcohol violations, and drug activity. According to Agent French, the Rapid Gas Stop was chosen for surveillance because it was a "high-crime area" that had experienced a high volume of firearm related offenses.

The Rapid Gas Stop's entrance faces east towards a row of gas pumps that runs north to south. (*See* Gov. Ex. 1 (Map of Rapid Gas Stop Parking Lot); Def. Ex. B (Same).) On July 24, 2025, the Rapid Gas Stop displayed a "no firearms" sign next to its entrance. (Gov. Ex. 2 (Picture of "No Firearms" Sign).) Between the entrance and the row of gas pumps, is a row of parking spots running north to south along the front face of the building. (Gov. Ex. 1; Def. Ex. B.) Along the southern edge of the property is another row of parking spots running east to west. (*Id.*).

On July 24, 2025, Agents French, Criss, and Eric Koller,[3] were in an unmarked police vehicle parked at the southern edge of the property facing north. Agent Criss testified that, from where they were parked, they were approximately 40–60 feet away from the Rapid Gas Stop's entrance and could see the entrance. Agent Gaal was with Agent Mario Makris, another OIU agent, in a separate unmarked police vehicle parked elsewhere nearby, though he could not recall where. Sinkfield's vehicle was parked at the southernmost gas pump facing west, with the driver's side facing south.

From inside his vehicle, Agent French saw Sinkfield exit the Rapid Gas Stop and walk toward the gas pumps and his vehicle, allowing Agent French a direct view of his right side. Using his standard-issue, image-stabilizing binoculars, Agent French then observed the "print"[4] of a

---

[3] Agent Koller, like Agent Criss, accompanied Agent French as part of the OIU's field training program.

[4] The Court heard testimony from the agents regarding firearm "prints." According to the agents, the unique shape and weight of firearms, specifically handguns, leave a distinct outline, or "print," when concealed under clothing. As the agents testified, they are trained to look for the distinct points of what they call the firearm's "triangle" formed by (1) the tip of the firearm's barrel, (2) the firearm's hammer or rear sight, and (3) the baseplate of the firearm's magazine. The agents testified that these three points make distinct prints on clothing that can be distinguished from other objects people often carry, such as cellphones. According to the agents, the print of a firearm will typically be thicker and have sharper points than the print of a cellphone. On cross-examination, and after being pressed repeatedly, Agent Criss testified that a cellphone could possibly create a protrusion similar to a firearm. In any event, Agent Criss,

firearm on Sinkfield's person. Agent French testified that he observed the print of a magazine baseplate, a roughly two-to-three-inch protrusion, pressing against Sinkfield's shirt in the "right appendix area." On cross-examination, Agent French testified that he was able to observe this protrusion despite Sinkfield's "baggy" shirt. Agent French then observed Sinkfield cross the parking lot on his way to the gas pumps and his vehicle.

As Sinkfield crossed the parking lot to his vehicle, Agent French directed Agents Criss and Koller to observe Sinkfield. Agent Criss then used his standard-issue, image-stabilizing binoculars to observe Sinkfield. He testified that he, too, observed the print of a magazine baseplate protruding from under Sinkfield's shirt in the right appendix area. He further testified that, with the assistance of the binocular's image stabilization feature, he was able to observe this print despite the movement of Sinkfield's shirt.

### B.    The Approach and Seizure

Based on his observations, Agent French believed Sinkfield had committed a criminal trespass under Ohio Rev. Code § 2923.126(C)(3)(a) by possessing a firearm in a building marked with a "no firearms" sign. Agent French relayed his observations to other agents over the phone, and they decided to approach Sinkfield. Agents positioned unmarked police vehicles, with flashing (police) emergency lights, directly in front of and behind Sinkfield's vehicle. Agents Gaal and Makris were in the vehicle directly behind Sinkfield's. Agents testified that Sinkfield was outside of his vehicle pumping gas when agents began their approach. Then, according to the agents, Sinkfield became alert to the approaching agents and entered his vehicle.

---

at multiple points throughout the hearing, testified that cellphones have rounded corners that are distinguishable from the rigid points of a firearm.

Agent French then activated his body-worn camera ("bodycam"), exited his vehicle, and approached Sinkfield's vehicle. Agents Criss and Koller, as field trainees, stayed behind in the vehicle. Agent French's bodycam footage (Gov. Ex. 4 (Agent French's Bodycam Footage Part 1)) shows a tense and rapidly evolving scene.

The footage first shows Sinkfield's vehicle boxed in on either side by black vehicles with police emergency lights flashing and (initially) an airhorn sounding. Agent French and other officers, all wearing tactical vests clearly marked with "POLICE" placards, approached the vehicle with firearms drawn. Agent French could be heard announcing "police" and repeatedly ordering Sinkfield to put his hands up or show his hands.

The bodycam footage shows Sinkfield moving around inside his vehicle, but the tint of the vehicle's windows makes it difficult (at least as seen through the lens of the bodycam) to make out exactly what Sinkfield was doing. Agent French testified, however, that from his vantage point, he could see clearly through the front windshield of the vehicle and that he observed Sinkfield reaching around inside the vehicle, including into the vehicle's center console.[5] During this time, Agent French (and other agents), can be heard in bodycam footage repeatedly ordering Sinkfield to "put your hands up" and "show us your hands." Agent French testified that Sinkfield failed to comply. The bodycam footage shows that, after multiple commands to "put your hands up" and "show us your hands" went unanswered, an agent attempted to break the driver's side window of Sinkfield's vehicle.

---

[5] The Court notes that, in some shots from the bodycam footage, it appears difficult to see through the windows of Sinkfield's vehicle. Additionally, Agent Gaal testified that he could not see through the back window of Sinkfield's vehicle from inside his own vehicle and that he had difficulty seeing through the side window once outside of his vehicle. But the Court also notes that, in portions of both Agents French's and Gaal's bodycam footage (Gov. Ex. 4; Gov. Ex 6 (Agent Gaal's Bodycam Footage)), the interior of the vehicle can be seen through the windows. This, combined with Agent French's contemporaneous reporting of his observation of the vehicle's interior, as heard on his bodycam footage, supports Agent French's testimony that he could see into the interior of Sinkfield's vehicle.

At this point, Agent French can be heard on the bodycam telling his fellow agents, "He's reaching." Another agent is then heard directing his fellow agents to back away and take cover behind a vehicle. Agents then quickly backed away. The footage then shows Sinkfield exiting his vehicle with his hands down by his sides. Agent French can be heard commanding "do not reach for that firearm."

Sinkfield then took a step away from his vehicle and raised his hands, holding a black phone in his right hand. Multiple agents ordered Sinkfield to the ground, but, according to bodycam footage, Sinkfield did not immediately comply. An officer whom Agent French identified at the hearing as Agent Makris approached Sinkfield from behind and, with the help of Agent French and other agents, took Sinkfield to the ground and placed handcuffs on him. In the bodycam footage, Agent French and another agent can be heard telling Sinkfield that he is "under arrest."

### C.    Post-Arrest Investigation

Immediately after officers arrested Sinkfield, Agent Gaal approached the open driver's side door of Sinkfield's vehicle. Agent French, in his bodycam footage, can be heard telling Agent Gaal, "He reached in the center console—he put it in the center console." Agent Gaal testified, that based on Agent French's statements, he believed the vehicle's center console contained evidence of criminal activity—specifically, the firearm that Agent French previously reported observing on Sinkfield's person. Agent Gaal's bodycam footage (Gov. Ex. 6) then shows Agent Gaal searching the center console of Sinkfield's vehicle, removing, *inter alia*, a handgun in a holster. Agent Gaal testified that he found the firearm loaded, and that he unloaded it and cleared its chamber before giving it to Agent French.

Agent French then processed the firearm Agent Gaal recovered from Sinkfield's vehicle, as seen in another portion of Agent French's bodycam footage. (Gov. Ex. 5 (Agent French's

6

Bodycam Footage Part 2).) In the bodycam footage, Agent French demonstrates to Agents Criss and Koller, who by this point had joined Agent French outside of their police vehicle, how to process evidence and appropriately notate an evidence bag. Agent French can be seen writing his badge number on the evidence bag, followed by the phrase "right appendix" to record his prior observation of where he saw the firearm on Sinkfield's person.

Agent French is then heard asking Agents Criss and Koller, "Did you guys see it? If not, that's okay." Agent French testified that he asked in this manner to ensure that neither agent felt pressured to say that they agreed with him. In the footage, Agent Criss is seen responding to Agent French by gesturing to his right appendix area. On the stand, Agent Criss confirmed that he also saw the print and that his observation was not the result of any pressure. Agent French then wrote Agent Criss's badge number on the evidence bag under his own to indicate that Agent Criss also observed the firearm on Sinkfield's person.

Agent French later approached the entrance of the Rapid Gas Stop to capture on his bodycam the "no firearms" sign. (Gov. Ex. 2.) The sign was situated to the side of the door and was not obstructed. The sign was in black and white, presented a picture of a handgun enclosed by a circle with a line crossed through it, and was printed on an eight-by-eleven-inch sheet of paper. The printed area did not fill the entire sheet; in total, the printed area appears to be approximately nine-by-six inches.

On cross-examination, Agent French testified that there came a time after Sinkfield's arrest when Agent French noticed that the "no firearms" sign at the Rapid Gas Stop was no longer posted. In line with OIU practice, Agent French asked either an employee or a manager[6] at the Rapid Gas Stop whether they wanted a new "no firearm" sign and said that he could put it up for them if they

---

[6] Agent French did not know the name or precise title of the person with whom he spoke.

so wished. According to Agent French, the person with whom he spoke told Agent French that he could put up a new sign, and Agent French affixed the OIU's standard "no firearms" sign to the Rapid Gas Stop's front door.[7] (Def. Ex. G (New "No Firearms" Sign).) The new sign is similar to the original sign save that it is printed in red and fills a larger area of the paper.

After arresting Sinkfield, the agents did not attempt to retrieve surveillance footage from the Rapid Gas Stop. Agent French testified that he did not feel the surveillance footage was necessary, and that store owners are often hesitant to provide such footage because they would prefer to not be brought to court to testify. On cross-examination, Agent French testified that he had obtained surveillance footage from that Rapid Gas Stop in prior investigations, and that the manager did not show any reluctance to provide such footage at the time. He further testified that he had no reason to believe that the manager would be reluctant to provide relevant footage in this case.

## II.    LAW & DISCUSSION

The Fourth Amendment protects "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The Fourth Amendment proscribes warrantless searches and seizures, *id.*, but because its "ultimate touchstone is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006) (citation omitted).

---

[7] Investigator Clark tells a different story. Investigator Clark's testimony was largely limited to recounting a conversation he had in January 2026 (several months after the stop and arrest of Sinkfield) with the manager of the Rapid Gas Stop. According to Investigator Clark, the manager stated that, while the original, black-and-white "no firearms" sign was still posted, OIU agents instructed him that a new "no firearms" sign had to be affixed to the entrance. From the record, it is unclear whether the manager Investigator Clark spoke to is the same person Agent French spoke to. For the reasons set forth herein, the Court does not credit this version of events.

This motion implicates three exceptions to the warrant requirement. As to seizures, there are two relevant warrant exceptions: (1) temporary involuntary detentions or *Terry* stops (based on *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)), predicated on reasonable suspicion, and (2) arrests based on probable cause. *See United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (citations omitted). As to searches, there is one relevant warrant exception: the automobile exception, which provides that, "police officers may conduct a warrantless search of a vehicle if they have probable cause to believe that the vehicle contains evidence of a crime." *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007) (quotation marks and citations omitted).

### A.    Arrest vs *Terry* Stop

Before addressing these exceptions, however, the Court must first determine the type of seizure to which Sinkfield was subject. At the evidentiary hearing, Sinkfield argued that he was arrested, thus requiring probable cause. The government argued that the agents executed a *Terry* stop, and thus only required reasonable suspicion. In a way, both are correct. As discussed below, agents executed a *Terry* stop when they blocked in Sinkfield's vehicle, but they executed an arrest when they took him to the ground, handcuffed him, and announced his arrest.

A *Terry* stop is a brief stop conducted for the limited purpose of investigating an officer's suspicions. *See United States v. Bailey*, 302 F.3d 652, 658 (6th Cir. 2002) ("Under *Terry*, a law enforcement officer may briefly stop and detain an individual for investigative purposes . . . ." (citation omitted)). A full arrest occurs when "a reasonable person in the defendant's position [would] have felt that he was under arrest or was otherwise deprived of his freedom of action in any significant way." *Sutton v. Metro. Gov't of Nashville & Davidson Cnty.*, 700 F.3d 865, 874 (6th Cir. 2012) (quoting *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991)).

The first act of seizure to which agents subjected Sinkfield was blocking in his vehicle. The Sixth Circuit holds that blocking in a vehicle constitutes a *Terry* stop. *See United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) ("[Defendant] is correct that when [the officer] blocked the car in, he began an investigatory *Terry* stop."); *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) ("We agree with the district court's finding that 'the blocking of [defendant's car] to determine the identity of the occupants and maintain the status quo while obtaining this information was a warrantless *Terry* seizure.'"). Thus, agents blocking in Sinkfield's vehicle initiated a *Terry* stop that must have been supported by reasonable suspicion.

The second act of seizure was taking Sinkfield to the ground, handcuffing him, and announcing that he was "under arrest." At this point, Sinkfield was clearly under arrest. A reasonable person, upon being handcuffed, taken to the ground, and hearing the words "you are under arrest," would have felt that they were under arrest. *Cf. Crawford v. Geiger*, 656 F. App'x 190, 202–3 (6th Cir. 2016) (holding claimant was arrested when officers shoved her, took her to the ground, and handcuffed her). Accordingly, the agents' actions at this moment must have been supported by probable cause.

### B.     Reasonable Suspicion

Having determined that agents executed a *Terry* stop by blocking Sinkfield's vehicle in, the Court must determine whether agents had reasonable suspicion to support that stop. Under the *Terry* doctrine, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (citing *Terry*, 392 U.S. at 30). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Id.* (quoting *Terry*, 392 U.S. at

10

27 (quotation marks omitted)). Still, "[t]he officers need only 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Sheckles*, 996 F.3d 330, 343 (6th Cir. 2021) (quoting *Kansas v. Glover*, 589 U.S. 376, 380, 140 S. Ct. 1183, 206 L. Ed. 2d 412 (2020) (further citation omitted)). Moreover, that there may be a possible innocent explanation for each fact when considered separately does not defeat a finding that, together, the facts contribute to reasonable suspicion. *See United States v. Arvizu*, 534 U.S. 266, 277, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). This is true even if these facts "would arouse suspicion only in someone experienced in law enforcement matters." *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993) (citation omitted); *see Arvizu*, 534 U.S. at 273–78 (explaining that officers may rely on their experience in evaluating totality of circumstances and "need not rule out the possibility of innocent conduct").

The government argues that the agents had reasonable suspicion that Sinkfield violated Ohio's criminal trespass statute, which prohibits, in relevant part, knowingly carrying a firearm on a private premises on which a "no firearms" sign is conspicuously located. *See* Ohio Rev. Code § 2923.126(C)(3)(a). The government bases its argument on the agents' observations that (1) Sinkfield exited the Rapid Gas Stop, (2) the Rapid Gas Stop had a conspicuously located "no firearms" sign, and (3) the print of a firearm baseplate protruded from under Sinkfield's shirt. (Doc. No. 38, at 5–7.) Sinkfield does not appear to challenge that agents saw Sinkfield exit the Rapid Gas Stop. Rather, he challenges the remaining two factual assertions, that agents believed the "no firearms" sign to be conspicuously located and that agents saw the print of a firearm on Sinkfield's person. (Doc. No. 23, at 3–7; Doc. No. 41, at 2–3.)

Based on the testimony and evidence presented, the Court credits the government's version of events. First, Agent French testified that he believed the Rapid Gas Stop's "no firearms" sign

11

was conspicuously located. Sinkfield suggests that this testimony should not be credited in light of Investigator Clark's testimony that an OIU agent later (and there is no indication of how much later—as in days, weeks, or months) returned to the Rapid Gas Stop and instructed the store manager to replace the "no firearms" sign with a new "no firearms" sign. (Doc. No. 45, at 4–5.) Sinkfield essentially argues that such ex post facto "remedial measures" show that Agent French found the sign insufficient. Contrary to this version of events, Agent French testified, that when he asked an employee or manager at the Rapid Gas Stop whether they wanted a new sign, the prior sign had already been removed by someone else—"there was the sign missing" and "that sign was gone." Thus, as Agent French suggested, he was remedying the complete lack of a sign—not an existing sign that he found inconspicuously located.

The Court credits Agent French's testimony. First, the record is unclear as to whether the manager with whom Investigator Clark spoke was the same person with whom Agent French spoke. Indeed, Investigator Clark did not testify that the manager identified Agent French as the OIU agent he spoke to, and Agent French was unsure if he spoke to a manager or some other type of employee. Without something more, Investigator Clark's second-hand recounting of a conversation the manager had with an OIU agent who may or may not have been Agent French sheds little light on Agent French's state of mind. Second, and perhaps most importantly, Investigator Clark's testimony is based entirely on hearsay statements, while Agent French's testimony is a first-hand account. While the rules of evidence do not strictly apply in suppression hearings, *United States v. Killebrew*, 594 F.2d 1103, 1105 (6th Cir. 1979) (citation omitted), hearsay evidence is still "presumptively less reliable than direct testimony." *Knickerbocker v. Wolfenbarger*, 212 F. App'x 426, 433 (6th Cir. 2007). Moreover, the Court had the opportunity to observe Agent French's demeanor when testifying. He seemed genuinely surprised by the question

12

on cross examination asking if he advised someone at the Rapid Gas Stop that the sign should be changed.

> Q:      Did you advise them that [the sign] should be changed?
>
> A:      Sorry. Changing the sign? There was the sign missing. So I did go there –
>
> Q:      What sign was missing?
>
> A:      That sign[8] was gone.
>
> Q:      So a time came when that sign was down and there was no sign?
>
> A:      Correct.

(Doc. No. 53 (Transcript of Hearing), at 89.)

In light of the foregoing, the Court credits Agent French's testimony that on the day that Sinkfield was stopped and arrested, he believed that the "no firearms" sign was conspicuously located. Moreover, considering that the "no firearms" sign was posted next to the front entrance at roughly eye level and was unobstructed (Gov. Ex. 2), the Court finds that Agent French's belief was reasonable.[9]

Second, the Court credits Agents French's and Criss's testimony that they saw the print of a firearm baseplate on Sinkfield. Agents French and Criss both testified that, from their vantage point in the parking lot, they were able to see the print protruding from Sinkfield's right appendix area using the assistance of their image-stabilizing binoculars. They both testified that they received training on distinguishing the print of a concealed firearm from other objects. Their

---

[8] At this point in the hearing, a picture of the original "no firearms" sign (Def. Ex. E) was being displayed in the courtroom. The Court understood "that sign" to refer to the original "no firearms" sign being displayed.

[9] Importantly, the issue here is not whether the "no firearms" sign was conspicuously placed as a matter of law, but whether Agent French had a "reasonable belief" that it was. *Cf. United States v. Brown*, 310 F. App'x 776, 780 (6th Cir. 2009) ("[Officer's] observation that [defendant] was carrying a container that appeared to be open, coupled with her *reasonable belief* that [applicable] law made that conduct illegal, at the very least provided [officer] with reasonable suspicion that Brown was violating the law." (emphasis added)).

testimony is supported by the contemporaneous statements they made in Agent French's bodycam footage. (Doc. No. 5 (Agent French ordering Sinkfield to "not reach for that firearm."); Doc. No. 6 (Agents French and Criss indicating that they observed a firearm protruding from Sinkfield's right appendix area).) Further, while Agent Criss, notably a field trainee at the time, testified (after being repeatedly pressed on cross-examination) that a cellphone *could* make a similar print as a firearm, Agent French, with his greater experience, testified unequivocally that a cellphone could not have made the print that he observed on Sinkfield due to the rigidity and thickness of the print. Agent Criss, at multiple points throughout the hearing, corroborated this testimony, stating that cellphones have rounded corners that are distinguishable from the rigid points of firearms. Finally, the agents' demeanor on the stand provided no reason to doubt their testimony.

Based on these facts, agents had reasonable suspicion to stop Sinkfield. The Sixth Circuit has held that an officer's observation of a firearm print on one's person, when carrying such a firearm is illegal, provides reasonable suspicion. *See United States v. Bell*, 572 F. App'x 417, 419 (6th Cir. 2014) (in Michigan, where concealed firearms are illegal, "[t]he officer's belief, based on his eyewitness observations, that the defendant had a bulge in his pocket that was in the shape of a gun provides 'reasonable suspicion' under the *Terry* doctrine[.]"). Here, agents saw Sinkfield with a firearm print protruding from his person exiting a premises marked with a "no firearms" sign. These observations, informed by training and experience, provided an objective, particularized basis to suspect Sinkfield of violating Ohio's criminal trespass statute. Agents thus had reasonable suspicion to stop Sinkfield.

### C.     Probable Cause to Arrest

The Court must next determine whether agents had probable cause to arrest Sinkfield when they took him to the ground, handcuffed him, and announced his arrest. "An arrest without a

warrant does not violate the Fourth Amendment if probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law." *United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998) (citation and quotation marks omitted). "To determine whether probable cause existed, [the Court] ask[s] whether at the time of the arrest an officer knows of facts and circumstances 'sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *McCray v. Metrish*, 232 F. App'x 469, 480 (6th Cir. 2007) (quoting *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964)). "Probable cause may be supported by 'less than prima facie proof but more than mere suspicion.'" *King v. City of Rockford, Michigan*, 97 F.4th 379, 391 (6th Cir. 2024) (quoting *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)).

At the evidentiary hearing, the government argued that agents had probable cause to arrest Sinkfield based on the same observations that provided reasonable suspicion plus agents' subsequent observations that Sinkfield (1) retreated into his vehicle as officers approached; (2) reached around inside his vehicle, including into the center console; and (3) generally failed to comply with officers' orders. Sinkfield again challenges the observations underlying reasonable suspicion and further argues that agents could not have observed Sinkfield inside his vehicle. The Court already addressed the facts underlying reasonable suspicion (*see supra* § II(B)), so the Court focuses the below analysis on the agents' observations following the initial stop and whether they elevated the agents' reasonable suspicion into probable cause.

The Court credits the government's version of events. First, Agent Criss's testimony that Sinkfield was pumping gas outside of his vehicle when agents first approached, Agent French's similar testimony that Sinkfield was outside of his vehicle when agents first approached, and the bodycam footage showing Sinkfield in his vehicle after the initial approach, all corroborate the

15

testimony of Agents Criss and Gaal that Sinkfield retreated into his vehicle upon seeing agents. Second, as discussed above (*see supra* n.5), the fact that the interior of the vehicle is visible in some portions of the bodycam footage, coupled with Agent French's contemporaneous reports to his fellow agents that "he's reaching"[10] and "he reached in the center console—he put it in the center console[,]" lend credence to Agent French's testimony that he observed Sinkfield reaching around his vehicle and into the center console. Finally, Sinkfield's reaching around his vehicle corroborates the assertion that Sinkfield failed to comply with the order to "show us your hands."

Based on the totality of circumstances, the agents had probable cause to arrest Sinkfield. Sinkfield's retreat into his vehicle, his furtive movements while inside the vehicle, and his failure to comply, coupled with the agents' prior reasonable suspicion that Sinkfield had committed a criminal trespass, established probable cause for the arrest. *See United States v. Dotson*, 49 F.3d 227, 231 (6th Cir. 1995) ("[Defendant]'s efforts to flee, coupled with [officer's] reasonable suspicion that [defendant] was involved in criminal activities, established probable cause to arrest [defendant]." (collecting cases)); *United States v. Peake-Wright*, 126 F.4th 432, 439 (6th Cir. 2025) ("[E]vasive behavior and nervousness may be considered as part of the probable cause analysis[.]" (quoting *United States v. Lyons*, 687 F.3d 754, 770 (6th Cir. 2012))); *Braswell v. McCamman*, 256 F. Supp. 3d 719, 736 (W.D. Mich. 2017) (finding failure to raise hands when lawfully ordered to supported probable cause to arrest where officer suspected arrestee had firearm).

**D. Probable Cause to Search**

Finally, the Court must determine whether agents had the authority to search Sinkfield's vehicle without a warrant. As discussed above, "police officers may conduct a warrantless search

---

[10] The agents' actions in retreating to safety or "cover" when Agent French yelled "he's reaching" as he observed Sinkfield in his vehicle also corroborates that Agent French believed that Sinkfield had a firearm.

of a vehicle if they have probable cause to believe that the vehicle contains evidence of a crime." *Smith*, 510 F.3d at 647 (quotation marks and citation omitted). "In the context of a search, probable cause requires only 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Washington*, No. 21-5745, 2022 WL 1224553, at *3 (6th Cir. Apr. 26, 2022) (quotation marks and citation omitted). "Determining whether probable cause existed at the time of the search is a commonsense, practical question to be judged from the totality-of-the-circumstances. [] In determining whether probable cause exists, we may not look to events that occurred after the search or to the subjective intent of the officers; instead, we look to the objective facts known to the officers at the time of the search." *Smith v. Thornburg*, 136 F.3d 1070, 1074–75 (6th Cir. 1998) (quotation marks and citations omitted).

The government asserts that agents had reason to believe that Sinkfield had illegally carried a firearm in a premises marked with a "no firearms" sign and that Sinkfield had deposited that firearm in his vehicle. (Doc. No. 38, at 8.) Thus, the government argues, agents had probable cause to believe Sinkfield's vehicle contained evidence of (1) Sinkfield's criminal trespass in violation of Ohio Rev. Code § 2923.126(C)(3)(a) and (2) his violation of Ohio Rev. Code § 2923.16(B), which makes it a felony to have a loaded firearm anywhere in a vehicle where it is accessible to the operator or passengers. (*Id.*) Sinkfield does not address these arguments other than to repeat his now rejected arguments that the initial stop and arrest were unlawful. (Doc. No. 41, at 2–3.)

The Court agrees with the government. As the Court found above, agents saw Sinkfield exit a premises marked with a "no firearms" sign with the print of a firearm baseplate protruding from his person. He then went to the gas pumps and pumped gas. As agents approached Sinkfield, he retreated into his vehicle and began making furtive movements inside the vehicle, including reaching into the vehicle's center console. These facts raise the fair probability that Sinkfield

17

deposited a firearm in his vehicle. A search of Sinkfield's vehicle was thus permissible under the automobile exception. *See United States v. Winston*, No. 13-cr-20394, 2013 WL 6667729, at *9 (E.D. Mich. Dec. 18, 2013) (finding search valid under automobile exception where officers were responding to reports of firearms-related offenses and saw defendant "reaching towards the floorboards of the vehicle" as they approached).

## III.  CONCLUSION

The record establishes that agents had reasonable suspicion to stop Sinkfield, probable cause to arrest Sinkfield, and probable cause to search his vehicle. Accordingly, Sinkfield's motion to suppress (Doc. No. 23) is DENIED.

**IT IS SO ORDERED**.

Dated: March 17, 2026

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

18