**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, Plaintiff, | ) | CASE NO. 1:25-cr-397 |
| | ) | CHIEF JUDGE SARA LIOI |
| v. | ) | |
| MAURICE J. SINKFIELD, Defendant. | ) | **MEMORANDUM OPINION AND ORDER** |

Before the Court is the motion of defendant Maurice J. Sinkfield to correct or modify the record under Fed. R. App. P. 10. (Doc. No. 104 (Motion).) The United States of America (the "government") opposes. (Doc. No. 111 (Opposition).) For the reasons stated below, the motion is DENIED.

## I. BACKGROUND

The present motion concerns a recorded interview played during the trial testimony of defense witness Jeremiah Jackson. (Doc. No. 104, at 1.)[1] Jackson testified at Sinkfield's trial on July 8, 2026 (*see generally* Doc. No. 103 (07/08/2026 Trial Transcript), beginning at 117), but to fully understand the saga of Jackson's testimony, the Court must begin earlier. Sinkfield was previously set to go to trial on May 11, 2026 (Doc. No. 26 (Ends of Justice Order), at 2), on charges that he was a felon in possession of a firearm and/or ammunition, in violation of 18 U.S.C. §§

[1] All page number references herein are to the consecutive page numbers applied to each individual document by the Court's electronic filing system.

922(g)(1) and 924(a)(8), and had escaped from custody, in violation of 18 U.S.C. § 751(a). (*See generally* Doc. No. 10 (Indictment).)

On May 5, 2026, Sinkfield disclosed Jackson as a witness. (Doc. No. 80 (Witness List), at 1.) That same day, Sinkfield moved for Jackson to be permitted to testify via video call because he had recently suffered an accident that left him likely hospital- or home-bound for months. (Doc. No. 81 (Motion to Have Witness Testify by Video), at 2.) The Court granted the motion but made clear that defense counsel was "to make appropriate arrangements for the witness's video testimony[.]" (05/05/2026 Order [non-document].) Later that day, government agents conducted an interview of Jackson at the hospital.[2] (Doc. No. 103, at 61, 136.) That interview produced the recording at issue in the present motion.

On May 11, 2026, the day trial was set to begin, defense counsel moved to continue the trial "due to the unexpected unavailability of a witness defendant believe[d] material to his case" (05/11/2026 Minutes of Proceedings [non-document]), that witness being Jackson. According to defense counsel, Jackson was suffering complications from his earlier accident and was having trouble communicating such that he would be unable to testify. The Court granted the motion (*id.*) and set trial for the week of July 6, 2026. (Doc. No. 88 (Ends of Justice Order), at 2.)

Trial began on July 6, 2026 (*see generally* Doc. No. 107 (07/06/2026 Voir Dire Transcript); Doc. No. 108 (07/06/2026 Trial Transcript)), and the government rested its case on July 8, 2026. (Doc. No. 103, at 101.) That same day, defense counsel, Assistant Federal Public Defender Darrin Thompson, called Jackson as a witness. (*Id.* at 117.) Jackson was permitted to testify via video call, and the jury was instructed as such. (*Id.*) Jackson's direct examination went relatively

[2] At trial, the government repeatedly referred to the interview as occurring on May 5, *2025*. (*See, e.g.,* Doc. No. 103, at 136.) Based on the government's representation that the interview occurred on the same day that Sinkfield disclosed his witness list (Doc. No. 103, at 57), the Court presumes that the government misspoke and that the interview occurred on May 5, *2026*.

smoothly. In general terms, Jackson testified that he and his brother, Sinkfield, worked for a marketing company during the summer of 2025 (*id.* at 119); that Sinkfield's coworkers would use Sinkfield's car and leave items in the car during this time (*id.* at 122–23); that Jackson was the one who put a firearm in Sinkfield's car (*id.* at 124–25, 128); and that the firearm was either black or silver. (*Id.* at 129.)

At the conclusion of direct examination, Jackson began speaking without a question pending before him. (*Id.* at 131.) He said that "[s]omebody was recording me in the hospital without my permission. Didn't nobody ask me . . . ." (*Id.*) Defense counsel advised Jackson that he could answer Jackson's questions after the case concluded, and the Court advised that cross-examination would begin. (*Id.*)

The government, through Assistant United States Attorney Kristen Rolph, began its cross-examination of Jackson. Jackson was able to answer some of the government's initial questions without incident. (*Id.* at 131–35.) But the cross-examination grew tense when the government asked Jackson about his May 5, 2026 recorded interview.

The government first asked Jackson if he had been interviewed by or talked to government agents on May 5, 2026. (*Id.* at 135–36.) Jackson answered, "No. They talked to me, and I was just answering some questions. I was trying to figure out who they was." (*Id.* at 136.) The government then asked whether, in the interview, he said that Sinkfield drove his own car the majority of the time. (*Id.*) Jackson stated that he did not remember, and the government then asked to play a portion of the recorded May 5, 2026 interview for impeachment purposes. (*Id.*) The Court permitted it. (*Id.*) The relevant portion of the recording was then played for Jackson twice. (*Id.* at 136–37.)

The government then asked Jackson to confirm his testimony on direct examination that the firearm he placed in Sinkfield's vehicle was either black or silver. (*Id.* at 139.) Jackson confirmed, and the government then asked if Jackson recalled saying "during that May 5, 202[6] interview that it was a chrome gun, specifically . . . 'like a little chrome 9.'" (*Id.*) Jackson responded that he could not remember which gun it was. (*Id.* at 140.)

When pushed on this point (*id.*), Jackson became what the Court can only charitably describe as uncooperative and argumentative[3]:

> Q. You said, "It was a little chrome 9," and moved --
> A. You got the recording. Can you play the recording? It should be on there. You was recording that whole time. Let's see if that adds up. Can you play it back, because y'all recorded me. Can you play the recording thing? Can you play it back on the recording to see if I said that or not because I don't remember that. I'm not quite sure.
> Q. You're disputing whether or not you said "It was like a little chrome 9"?
> A. You recorded it. Can you play the recording? If you y'all can record me, y'all can play that, to see if I said that or not. I don't remember. I told you I was off medicine. If we have the recording, we can play the recording. Can y'all play it back?
>
> . . .
>
> Q. Are you disputing the statement that you made when you stated "like a little chrome 9"?
> A. You have the recording. Can you play the recording for the court, please? I don't remember. If you have me recorded, can you play the recording? I don't remember that.

(*Id.* at 140–41.) Based on this testimony, the government requested that it be allowed to play a portion of the recorded interview, and the Court permitted it. (*Id.* at 141.) The relevant portion of the recording was then played. (*Id.*)

After the relevant portion was played, Jackson grew even more uncooperative, largely refusing to answer any questions and demanding that the recording be played:

[3] A cold reading of the transcript does not capture Jackson's tone and demeanor throughout his cross-examination. He was loud, aggressive, disrespectful, and disruptive.

> Q. Sir, you heard yourself on that clip on May 5, 202[6], state -- when you are describing the gun at issue and right now, in your testimony, it was "like a little chrome 9," correct?
> A. And after that part -- what did I say after that part? Y'all cutting out something. Can y'all play the part where y'all just cutting out something. It was something else being said.
> Q. You said "It was like a chrome 9," and that was the firearm?
> A. And even if I said that, I said I probably don't know. It probably could have been that or something. I'm quite sure I don't remember. So you cut that part off instead of y'all letting that part play. Why didn't you let the part play and finish out?
> Q. And you described the firearm -- the entire interview --
> A. Will you just let the recorded play out? That's the only way you're going to get all the information is let the recording play. Y'all have a full recorder right there. Let it play out. You are going to hear everything I say. You already got everything right there, so play it. Why not play it? It's something you hiding. What is you hiding?
>
> . . .
>
> Q. The only gun that you were discussing on May 5 and the only gun that we're discussing today is the gun that was possessed by Mr. Sinkfield, correct?
> A. I'm not quite sure. You have a recording right there. If y'all can play the recording, the recording could say everything we need to say. Y'all have a recording right there.
> Q. And you were told to get that gun that you described as a little chrome 9 and a box of bullets from your brother Aaron's house, correct?
> A. You have the recording. Can you play the recording?
> Q. Sir, is that correct?
> A. You have the recording, ma'am. If you could play the recording, you would probably hear everything I just said. You asked me. You already got the answers. If that's what you're telling me, you already got the answers. So why is you asking me something that you already got? If you could play the recording. If you have the recording, then play it.

(*Id.* at 142–44.)

The Court initiated a sidebar. (*Id.* at 144.) At the sidebar, in an attempt to move beyond this apparent impasse, the parties stipulated that Jackson "does not discuss another firearm in connection with that car [the car in which the relevant firearm was found] on that day." (*Id.* at 146.) The stipulation, however, did not help, and Jackson continued in his recalcitrance:

> Q. And, Mr. Jackson, you remember getting the gun and the box of bullets from your brother Aaron's house and putting it --
> A. It's in the recording.
> Q. Putting it in Mr. Sinkfield's car like it was yesterday, correct?
> A. It's in the recording.

> THE COURT: Mr. Jackson, you need to answer the question, please.
> THE WITNESS: It's in the recording, ma'am. You are going to get everything you need.
> THE COURT: Mr. Jackson, you need to answer the question, please.
> THE WITNESS: I just did, ma'am. She has the recording.
> THE COURT: She's asking you a question.
> THE WITNESS: I don't need nobody switching up my words. It's all in the recording. They recorded it. Can I ask to play the recording? If you have a recorder, please play it.
> THE COURT: No. You get to answer the question. She's asking you a question, and I am directing you and instructing you to answer the question, please.
> THE WITNESS: Could she repeat the question, because how do y'all keep asking questions of me, but I can't ask any questions back.
> THE COURT: So she will repeat the question.
> BY MS. ROLPH:
> Q. Sir, you are remember getting the gun and the box of bullets from your brother Aaron's house and putting it in Mr. Sinkfield's car like it was yesterday, correct?
> A. I believe that was -- I believe that was said in the recording.
> Q. And isn't it true you placed the gun and the box of ammo in the center console of Mr. Sinkfield's car?
> A. I'm not quite sure. It's in the recording.

(*Id.* at 147–49.) At this point, the government requested that a portion of the recording be played for purposes of impeachment. (*Id.* at 149.) The Court permitted it, and the relevant portion of the recording was played. (*Id.*) After the relevant portion was played, the recording continued for about half of a sentence before it was stopped.[4] Jackson did not take well to the recording being stopped mid-sentence, leading to the following exchange:

> A. What did I put in the middle console? What did I put in the middle console? Do not just sit there and play I put that in the middle console. What did I put in the middle console? Play that [expletive] part, too.
> THE COURT: Mr. Jackson, you are -- you have --
> THE [WITNESS][5]: Ma'am, they're not giving the whole --
> THE COURT: I don't appreciate the language that you're using. Do not --
> THE WITNESS: Pardon my language.
> THE COURT: Well, just --
> THE WITNESS: Don't just say, oh, I put that in the console. What did he put in the console? Play what I did say I put in there?

[4] By the Court's recollection, playback stopped right as Jackson was heard saying, "Yeah, I did that. I put that in the middle—I put that in the . . . ."

[5] The transcript identifies the defendant, but by the Court's recollection, it was Jackson who said these words.

(*Id.* at 149–50.)

The government then requested a sidebar. (*Id.* at 150.) At sidebar, the government explained that it was attempting to lay a foundation with the witness to have relevant portions of the recorded interview played as prior inconsistent statements for impeachment purposes. (*Id.* at 151.) But the government recognized that the process was "painful" considering "how extremely hostile this witness is[.]" (*Id.* at 150–51.) The government thus proposed that the entire recording be played in court. (*Id.* at 151.) Defense counsel, after conferring with Sinkfield, agreed to the government's proposal. (*Id.* 151–52.)

Defense counsel then asked that the recording be marked as an exhibit for the record. (*Id.* at 153.) The Court denied the request because the recording was being used solely for impeachment purposes. (*Id.* at 153–55.) On this point, the following exchange occurred between the Court, Assistant Federal Public Defender Darrin Thompson, and Assistant United States Attorney Kristen Rolph:

> THE COURT: I think the parties have agreed to allow it to be played so that we don't have to have these piecemeal playing of the recording once the government has established that there is a basis for impeachment. So I'm not sure -- I mean, you have a copy of this?
> MR. THOMPSON: We do Your Honor.
> THE COURT: Since it's for impeachment purposes, everybody would agree that it doesn't come in as evidence, correct?
> MS. ROLPH: Correct, Your Honor.
> MR. THOMPSON: I think that's correct, Your Honor.
> THE COURT: Okay. So I'm not sure why we're going to mark it because it would give the jury an impression that it's an exhibit that they might see and it is not, in fact, an exhibit that they will see.

(*Id.* at 154.)

The Court then instructed the jury that the entire recorded interview would be played and that they were only to consider it for purposes of impeachment. (*Id.* at 155.) The recorded interview

was then played in its entirety. (*Id.* at 155, 158.)[6] After the recording was played, the government asked a few more questions of the witness, and Jackson's testimony was concluded. (*Id.* at 160-61.)[7]

Sinkfield was later convicted on both of the charges against him. (Doc. No. 96 (Jury Verdict).) Sentencing is currently set for October 27, 2026. (07/08/2026 Minutes of Proceedings [non-document].)

## II. LEGAL STANDARD

The record on appeal consists of "(1) the original papers and exhibits filed in the district court; (2) the transcript of proceedings, if any; and (3) a certified copy of the docket entries prepared by the district clerk." Fed. R. App. P. 10(a). If any party believes that the record does not accurately reflect the proceedings before the district court, the party may move the district court to correct or modify the record under Rule 10(e), which provides in relevant part,

> (1) If any difference arises about whether the record truly discloses what occurred in the district court, the difference must be submitted to and settled by that court and the record conformed accordingly.
>
> (2) If anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected and a supplemental record may be certified and forwarded: . . . (B) by the district court before or after the record has been forwarded . . . .

Fed. R. App. P. 10(e)(1–2).

Importantly, "[t]he district court has only a narrow band of discretion to change or modify the record on appeal. [Rule] 10(e) allows modification of the record in only two instances; namely,

[6] Playback was paused part way through because Jackson was seen on his video feed holding his phone to his face and moving his mouth. (Doc. No. 103, at 156.) The Court admonished Jackson that he was not to communicate with anyone during the pendency of his testimony. (*Id.* at 156–57.) Jackson denied that he was communicating with anyone. (*Id.* at 157.) After the phone was given to the defense counsel staff facilitating Jackson's video testimony, the remainder of the recording was played. (*Id.* at 158.)

[7] Jackson and the defense counsel staff facilitating his video testimony were also questioned, outside of the presence of the jury, on whether Jackson had communicated with anyone during his testimony. (Doc. No. 103, at 162–169.)

when the parties dispute whether the record actually discloses what occurred in the district court and when a material matter is omitted by error or accident." *Canaday v. Kelley*, 37 F.3d 1498, 1994 WL 567512, at *11 (6th Cir. 1994) (Table) (citations omitted).

## III. DISCUSSION

To begin, Sinkfield fails to establish the need for a modification under Rule 10(e)(1). Rule 10(e)(1) requires some dispute "about whether the record truly discloses what occurred in the district court[.]" Fed. R. App. P. 10(e)(1). Neither Sinkfield nor the government argue that the record fails to accurately depict what occurred at trial with respect to the recorded interview. And neither party could. The record reflects that the recording of Jackson's interview was played in open court, first in portions and then in its entirety, for impeachment purposes. (*See generally* Doc. No. 103, at 136–61.) That is precisely what happened. Accordingly, Sinkfield's motion is DENIED to the extent it seeks correction or modification under Rule 10(e)(1). *See United States v. Swinton,* No. 6:15-cr-6055, 2019 WL 697409, at *2 (W.D.N.Y. Feb. 20, 2019) (denying Rule 10(e)(1) motion upon finding trial transcript accurately reflected proceedings).

Neither does Sinkfield establish the need for a modification under Rule 10(e)(2). Rule 10(e)(2) covers the situation where an item was accidentally or erroneously omitted from or misstated on the record. Fed. R. App. P. 10(e)(2). Sinkfield appears to solely argue that the recording was omitted from—rather than misstated on—the record. (*See* Doc. No. 104, at 1 (moving Court to "*include* [in the record] the recording played as . . . Jackson's testimony at . . . Sinkfield's trial." (emphasis added)).) The primary issue thus becomes whether the recorded interview was accidentally or erroneously omitted from the record.

First, the recording's omission from the record was not accidental. Indeed, the Court and the parties intentionally omitted the recording from the record. The transcript reflects that, when

defense counsel originally requested that the recording be marked as an exhibit, the Court rejected the request explaining that the recording was being used solely for impeachment. (Doc. No. 103, at 153.) To drive this point home, the Court asked counsel "[s]ince it's for impeachment purposes, everybody would agree that it doesn't come in as evidence, correct?" (*Id.* at 154.) Both the government and defense counsel agreed. (*Id.*) There can thus be no argument that the recording was "accidentally" omitted from the record under Rule 10(e)(2). *Cf. Sewalk v. Valpak Direct Mktg. Sys., LLC*, No. 8:22-cv-168, 2023 WL 2602687, at *1 (M.D. Fla. Jan. 18, 2023) (denying motion to supplement record with affidavit court had previously struck from the record).

Neither was the recording's omission from the record erroneous. As discussed, the record consists of the original papers and exhibits filed with the court, the transcript, and a certified copy of the court docket. Fed. R. App. R. 10(a). The recording is not an original paper or exhibit filed with the Court. Indeed, the Court, in its discretion, *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983) ("It is well settled that the admission of tape recordings at trial rests within the sound discretion of the trial court." (citations omitted)), rejected the recording as an exhibit because it was solely impeachment evidence, and the parties agreed with the Court's determination. (Doc. No. 103, at 153–54.) The recording is not the transcript of proceedings, nor is it typical for recordings played in court to be incorporated into the transcript. *See, e.g., United States v. Cody*, 498 F.3d 582, 592 (6th Cir. 2007) (noting that trial transcript from district court stated "(CD PLAYING)" rather than transcribing audio); *Robinson v. Berghuis*, No. 1:04-cv-722, 2008 WL 314707, at *5 (W.D. Mich. Feb. 4, 2008) (noting that trial transcript from state court did not incorporate transcript of recording played for jury). And neither is the recording a certified copy of the Court's docket. The recording is not properly part of the Court's record, and its omission therefrom cannot be erroneous under Rule 10(e). *See Brakebill v. Moncier*, No. 3:14-cv-105, 2016

WL 1029511, at *3 (E.D. Tenn. Mar. 15, 2016) (denying Rule 10(e) motion to supplement record where purportedly "missing" documents were not properly part of court record).

Sinkfield's primary argument to the contrary is that the recording should be made part of the record because it "comprises . . . Jackson's testimony at trial." (Doc. No. 104, at 1.) The recording, in fact, does not comprise Jackson's testimony at trial. All parties agreed at trial that the recording was used solely for impeachment purposes, was not to be marked as an exhibit, and was not to be presented to the jury. (Doc. No. 103, at 153–54.) The Court does not see how the recording could be part of Jackson's trial testimony (or any other part of the record) when its use was so limited. *See Roberts v. Alexandria Transp., Inc.*, No. 14-cv-1063, 2020 WL 8084270, at *2 (S.D. Ill. July 27, 2020) (denying Rule 10(e) motion where documents, while discussed in the trial transcript, were not entered into the record).

## IV. CONCLUSION

For the foregoing reasons, Sinkfield's motion to modify or correct the record (Doc. No. 104) is DENIED. That said, the Court will direct the Clerk to preserve the recording in its files in the event any appellate court wishes to review it.

**IT IS SO ORDERED**.

Dated: August 31, 2026

**HONORABLE SARA LIOI**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**